CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

DEC 2 1 2005

JOHN F. CORCORAN CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

TROY A. BORING, )
    Plaintiff, )
                     )     Civil Action No. 2:04cv00090
                     )
v. )
                     )     **MEMORANDUM OPINION**
                     )
JO ANNE B. BARNHARDT, )
**Commissioner of Social Security** )     BY: GLEN M. WILLIAMS
    Defendant. )     Senior United States District Judge
                     )
                     )

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## *I. Background and Standard of Review*

In this case, plaintiff, Troy A. Boring, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claims for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2003), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3) (West 2003 & Supp. 2005).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Boring filed his current applications for DIB and SSI on or about January 26, 2002, alleging disability as of March 30, 2001, due to bilateral patella femoral syndrome, lower mechanical back syndrome, post-traumatic stress disorder and bilateral subdeltoid bursitis. (Record, ("R"), at 65-69, 75, 286-90.) His claims were denied initially and on reconsideration. (R. at 41-45, 293-98.) Boring then requested a hearing before an administrative law judge, ("ALJ"). (R. at 54-55.) The ALJ held a hearing on February 20, 2003, during which Boring was represented by counsel. (R. at 380.)

By decision dated February 28, 2003, the ALJ denied Boring's claim. (R. at 14-23.) The ALJ found that Boring was insured for DIB purposes through December 31, 2001.[1] (R. at 22.) Furthermore, the ALJ found that Boring had not engaged in

---

[1]Thus, for DIB purposes, it must be determined whether Boring was disabled at some point on or prior to December 31, 2001.

-2-

substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ found that the medical evidence established that Boring suffered from a severe impairment, but that Boring did not have an impairment or combination of impairments listed at or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) The ALJ also found that Boring's allegations regarding his limitations were not totally credible. (R. at 22.) After considering the medical opinions of record regarding the severity of Boring's impairments and the testimony from a vocational expert, the ALJ found that Boring had the residual functional capacity to perform light[2] work, which could be performed with mild to moderate mental restrictions in the ability to perform work-related activities. (R. at 22.) Based on Boring's residual functional capacity, the ALJ found that Boring was able to perform his past relevant work as a maintenance worker. (R. at 22.) The ALJ found that Boring's medically determinable cervical and lumbar disc disease, post-traumatic stress disorder and substance abuse did not prevent him from performing his past relevant work. (R. at 22.) Thus, the ALJ found that Boring was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2005).

After the ALJ issued his opinion, Boring pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 6-8.) Boring then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481

---

[2]The regulations define light work as work that involves lifting objects weighing no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

(2005). The case is before this court on the Commissioner's Motion For Summary Judgment, filed March 28, 2005, (Docket Item No. 15), and Boring's Motion For Summary Judgment filed February 23, 2005. (Docket Item No. 13.) The court has heard arguments by the respective parties, and the matter is ripe for decision.

## II. Facts

Boring was born in 1971, (R. at 384), which classifies him as a younger person under 20 C.F.R. §§ 404.1563(c), 416.963(c). Boring completed high school and took welding classes at Mountain Empire Community College for a semester. (R. at 384, 398.) Boring's past work experience includes construction and maintenance. (R. at 384.)

At his hearing, Boring testified that he had not worked since his last hearing before the ALJ. (R. at 384.) Boring explained that he suffered from many serious problems that prevented him from working, most notably his inability to interact with people, post-traumatic stress disorder and pain in his lower back and neck. (R. at 385.) Boring further stated that he received Veterans Administration benefits based on 30-percent disability, which was due only to his post-traumatic stress disorder and not his musculoskeletal problems. (R. at 385, 387.) Boring denied receiving any treatment by a mental health professional for his emotional disorder and stated that he could not afford such treatment. (R. at 385.) Boring conceded that the Veterans Administration Medical Center, ("VA"), offered mental health treatment but explained that he did not have transportation to the facility. (R. at 385.)

-4-

When asked about his neck pain, Boring testified that the pain radiated into his shoulders. (R. at 386.) Boring stated that he lost range of motion and was unable to move his neck from side to side without pain. (R. at 386, 390.) Boring further stated that he had to move his eyes or his whole body to be able to look to the side. (R. at 390.) Boring also stated that he could not perform shoulder checks while driving but had to rely on his mirrors. (R. at 390.) On a scale from one to 10, Boring characterized his neck pain as a five or six, with an average of at least a three or four during the day. (R. at 386.) Boring also testified that he had never undergone neck or back surgery because he had not been a candidate for surgery. (R. at 386.)

When describing his back pain, Boring indicated that it encompassed his entire spine and radiated into his left leg to his knee. (R. at 386-87.) Boring also stated that he had back spasms in his back and neck. (R. at 387.) Boring further testified that both his neck pain and back pain had gotten progressively worse but had been "unrelenting" for the last three years, (R. at 393.) Boring also added that his back pain contributed to his sleeplessness. (R. at 399.) Boring described an incident in 1993, in which he injured his lower back lifting an item weighing less than 10 pounds. (R. at 397.) Boring had gone to the VA for emergency treatment but was sent to a private physician, since the injury was not service-related. (R. at 397.) Boring stated that he learned at this doctor's visit that he had broken a vertebrae, although he had no idea how the injury occurred. (R. at 397.)

Boring also testified that he suffered from knee pain. (R. at 392.) Boring stated that the VA diagnosed his problem as bilateral patella femoral syndrome

(otherwise known as runner's knee), which is slack in the cartilage caused by cartilage deterioration. (R. at 392.) Boring testified that his knee pain had been present since 1999 but had not increased in severity. (R. at 392.)

Boring further testified concerning his post-traumatic stress syndrome. (R. at 393-95.) Boring explained that while serving in the Gulf War in Bahrain, an air raid occurred while he was on guard duty outside a warehouse. (R. at 393.) Boring stated that he had just finished donning his chemical gear when a missile hit, blowing him backwards about 10 feet. (R. at 393.) After the attack, Boring helped carry bodies from the raid area, some of which had been his friends. (R. at 393.) Boring testified that this episode caused flashbacks and nightmares that occurred approximately three times a week. (R. at 394.) When asked if the nightmares or flashbacks interfered in any other way with his daily living, Boring stated that the nightmares caused bad moods and an increased agitation level. (R. at 394.) Boring further stated that he could not tolerate crowds of people because they made him think that something else could "come falling out of the sky." (R. at 395.) Boring also testified to sleep difficulty, mostly due to the post-traumatic stress disorder. (R. at 398.) Boring stated that he got five to six hours of sleep a night. (R. at 398.) Boring further testified that he could not tolerate loud noises because they made him cringe and caused cold chills. (R. at 394.) Boring added that he could not attend firework displays with his children and was affected by unexpected noises, such as clapping or the backfiring of a car. (R. at 394.)

When asked about daily activities, Boring stated that he generally stayed close to home. (R. at 388.) Boring testified that he could occasionally drive places, the

-6-

supermarket for example, but had to take a neighbor along to help him carry heavier items. (R. at 387-88.) Boring further stated that he did not help with meal preparation because he could not stand long enough to cook. (R. at 388.) Boring also denied helping his wife with cleaning and laundry. (R. at 398.) Boring stated that he did not attend church services, socialize with friends or pursue hobbies, but he watched a little television. (R. at 388.)

Boring further testified that he could sit for only 30 minutes before he had to stand and had to lie down for about 45 minutes to an hour each day. (R. at 389-91.) Boring further stated that he had to sit in a manner that kept the weight off his back. (R. at 391.) Boring testified that he had problems standing longer than 20 or 30 minutes because he experienced weakness in his knees and burning, stabbing pains and aches in his lower back. (R. at 391-92.) Boring also stated that it was very difficult to walk when he first stood up because his knees locked up, but after about 20 feet, he was able to walk normally. (R. at 395.) Boring testified that he could walk no more than 20 or 30 minutes and had to use the grocery cart as a walker in order to travel around the supermarket. (R. at 396.) Boring further testified that once he stopped walking, it was hard for him to start walking again. (R. at 395.) Boring also described limitations in his strength, with an inability to lift items weighing more than 10 or 15 pounds and occasional difficulty lifting items weighing under 10 pounds. (R. at 398.)

Donna J. Bardsley, a vocational expert, also testified at Boring's hearing. (R. at 399.) Bardsley described Boring's position as construction laborer as "heavy and unskilled," and the position of maintenance worker as "light and unskilled." (R. at

-7-

399.) Bardsley was then asked to consider Boring's height, weight, education and past relevant work experience and to assume that Boring had the residual functional capacity for light and sedentary work and had an emotional disorder with mild or moderate restrictions regarding his ability to perform work-related activities. (R. at 399.) Bardsley testified that there were jobs in the regional or national economy that Boring could perform such as sales clerk, stock clerk and cleaner, which were light, and cashier, information clerk, order clerk, stock clerk, hand packager, sorter and assembler, which were sedentary and light. (R. at 399-400.) Bardsley further stated that there were approximately 11 million light jobs in the national economy and 12,000 in the regional economy, while there were 2.5 million sedentary jobs in the national economy and 3,000 in the region. (R. at 400.)

Bardsley was asked to consider the same hypothetical but was asked to assume that Boring's emotional disorder placed greater than moderate restrictions on his ability to perform work-related activities. (R. at 400.) Bardsley stated that this limitation would eliminate all jobs from Boring's job base. (R. at 400.) Bardsley also indicated that there would be no jobs in the economy for Boring, if the ALJ found Boring's testimony concerning his pain and resulting restrictions on daily activities to be credible because Boring was forced to lie down every day. (R. at 400.)

In rendering his decision, the ALJ reviewed records from Mountain Home Veterans Administration Medical Center, ("Mountain Home"); Dr. Richard Norton, M.D.; Dr. Fred Litton, M.D.; Lee County Community Hospital; B. Wayne Lanthorn, Ph.D.; Frontier Health, Inc.; Lonesome Pine Hospital; Stone Mountain Health Services; Howard Leizer, Ph.D., a state agency psychologist; Dr. Richard Surrusco,

-8-

M.D., a state agency physician; and Dr. Kevin Blackwell, D.O.

Upon referral from Dr. Edward A. Walton, M.D., Boring sought medical treatment at the VA on February 25, 1995, for post-traumatic stress disorder. (R. at 155.) Boring was treated at the VA for post-traumatic stress disorder, as well as lower back pain, until July 31, 1995, when he reported that he was doing well and he had not experienced any nightmares since his last visit. (R. at 148-52.) At this visit, Boring further stated that the Gulf War incident was not on his mind and denied any problems at home. (R. at 148.) Boring described his home life as good and stated that he enjoyed spending time with his two children. (R. at 148.)

On April 28, 1998, Boring sought medical treatment at the VA for lower back pain. (R. at 145.) Boring was prescribed medications. (R. at 145.) On May 2, 1998, Boring sought medical treatment for his back pain from Dr. Richard Norton, M.D. (R. at 159.) Dr. Norton assessed that Boring had low back pain/fracture of pars, interarticularis of the right L5/spondylosis without spondylolisthesis and did not rule out left spondylosis. (R. at 159.) Dr. Norton prescribed Boring Lortab and encouraged him to return to the VA for a bone scan and reevaluation of his service-connected injury. (R. at 159.)

On May 2, 1998, Dr. Norton performed a spinal examination on Boring due to Boring's complaints of back pain. (R. at 160.) An x-ray of the lumbar region revealed degenerative changes in the facets at the L5-S1 level on both sides along with spondylolysis but no spondylolisthesis. (R. at 160.)

-9-

On June 12, 1998, Boring returned to Dr. Norton's clinic and was treated by Dr. Fred Litton, M.D. (R. at 158.) Dr. Litton assessed Boring with chronic low back pain and indicated that an x-ray showed changes of spondylolysis. (R. at 158.) Dr. Litton continued Boring's use of Lortab. (R. at 158.) On July 6, 1998, Boring visited Dr. Litton for a follow-up consultation. (R. at 157.) No changes were made in Boring's medication but Dr. Litton suggested Boring perform warm-up exercises and stretch after periods of inactivity. (R. at 157.)

On September 4, 1998, Boring again visited Dr. Norton for his back pain. (R. at 156). Dr. Norton was unable to treat Boring for chronic pain management without Boring's medical records before him. (R. at 156.) Dr. Norton gave Boring Arthrotec with no refill and noted that without the medical records, he would not continue pain management with narcotics. (R. at 156.)

On December 17, 1999, Boring was treated at Lee County Community Hospital for a head injury that he sustained in an automobile accident. (R. at 161-68.) Boring also complained of lower back, elbow and neck pain. (R. at 164.) Several x-rays were taken, and Dr. S. Navani, M.D., stated that the alignment of Boring's vertebral body was normal, but there was density at the anterosuperior angle of the body at CV4, probably representing ununited apophysis. (R. at 166.) Dr. Navani further noted that the x-rays of Boring's elbow, lumbosacral spine and chest were normal. (R. at 166-67.)

On referral by his attorney, Boring completed an initial screening form at Frontier Health, Inc., on June 16, 2000. (R. at 218.) Boring complained of

-10-

depression, post-traumatic stress disorder and an inability to tolerate crowds of people. (R. at 218.) Boring indicated that he was going to apply for SSI and DIB. (R. at 218.) On August 23, 2000, Tara Wells, R.N., of Frontier Health completed Boring's initial intake form. (R. at 194-205.) Boring indicated that he had suicidal tendencies and drug and alcohol problems in addition to his other medical problems. (R. at 194.) Boring also revealed that he sought treatment because his attorney believed that counseling would aid his disability case. (R. at 194.) Wells's diagnostic impressions were post-traumatic stress disorder, alcohol abuse, back pain arthritis, bursitis and Persian Gulf War Syndrome, by Boring's report. (R. at 199.) Wells recommended an alcohol/drug assessment, individual psychotherapy and a medical physical by Stone Mountain Health Services, ("Stone Mountain").

Boring began individual therapy at Frontier Health on August 29, 2000, when he saw Eric Greene, M.S., for his first session. (R. at 191-92.) Boring reported that he continued to have nightmares and flashback episodes. (R. at 192.) Greene diagnosed Boring with post-traumatic stress disorder and alcohol abuse. (R. at 191.)

On October 9, 2000, Boring attended individual therapy at Frontier Health with Greene, stating that he was doing well but still had panic attacks when he was forced to go out. (R. at 186.) Boring also complained of nightmares that occurred two or three nights a week. (R. at 186.) Boring was diagnosed with post-traumatic stress disorder and alcohol abuse. (R. at 186.) However, on November 15, 2000, Greene reported that Boring was not making adequate progress in his counseling because he was not attending sessions regularly. (R. at 183.) Greene also noted that Boring continued to use marijuana and had not tried to change his lifestyle to combat stress

and reduce his intrusive thoughts brought on by the Gulf War. (R. at 183.)

On December 21, 2000, Boring was treated at Lonesome Pine Hospital, ("Lonesome Pine"), for complaints of post-traumatic stress and neck pain. (R. at 223-25.) A radiograph of Boring's cervical spine revealed that there was not an acute bone injury, but there was straightening of the curvature, which could be due to a muscle spasm. (R. at 225, 367.) Dr. Subhas C. Saha, M.D., noted that there was density at the anterosuperior aspect of the C4 vertebra that could be due to a bony spur or a minor avulsion injury in the past. (R. at 225.)

On January 4, 2001, Boring sought medical treatment from Dr. Marissa G. Vito Cruz, M.D., of Stone Mountain complaining of neck pain, which was caused by turning or moving his neck. (R. at 236-37.) Dr. Cruz assessed Boring with neck pain, prescribed Lortab and Feldene and recommended neck exercises (R. at 236-37.)

On January 25, 2001, Boring was treated at the VA for neck injuries sustained in an automobile accident. (R. at 144.) A cervical spine x-ray was taken, which revealed no fractures or dislocations and no prevertebral soft tissue abnormalities. (R. at 144.)

On February 6, 2001, Greene of Frontier Health again noted Boring's absences from counseling sessions. (R. at 181.) Boring revealed that he had been charged with a substance-related offense of spousal battery and would have to attend anger management classes to meet the requirements of the court. (R. at 181.) On February 16, 2001, Boring informed Frontier Health that he would most likely not be returning

-12-

to the center, despite making no progress towards his goals. (R. at 180.) Boring stated that he had been accepted to psychiatric services at the VA. (R. at 180.)

On February 9, 2001, Boring returned to Dr. Cruz for a follow-up exam, where he stated that Lortab helped his pain but he wanted something stronger. (R. at 234-35.) Boring's cervical x-rays were normal, and Dr. Cruz reported no changes in her earlier assessment. (R. at 234.)

On March 21, 2001, Boring returned to the VA to inquire about the price for an anger management course. (R. at 122-24.) Boring was advised that the VA did not pay for services related to court-ordered classes. (R. at 122-23.) Boring also complained of post-traumatic stress disorder, cervical pain and nonexertional chest pain, which radiated into his left arm (R. at 122.) The VA recommended an orthopedics consultation for the cervical pain and a treadmill test for his chest pain. (R. at 123.) Dianne L. Hansen, Ph.D., a staff psychiatrist, suggested that Boring quit smoking, avoid alcohol and eat a low-cholesterol diet. (R. at 123.)

On April 2, 2001, Boring visited the exercise stress test laboratory at the VA for an exercise tolerance test. (R. at 142-43.) The test was given because of Boring's complaints of recent chest discomfort, which was characterized as a sharp, stabbing and substernal discomfort that tended to radiate into the left arm and hand. (R. at 142.) Boring's EKG showed a normal sinus rhythm with a rate of 72 and no ST-T wave changes. (R. at 142.) The test was negative for ischemia. (R. at 139.) Except for marked deconditioning, Boring had a normal exercise stress test. (R. at 143.) Boring was heavily counseled to quit smoking and to lose weight. (R. at 143.)

-13-

On April 9, 2001, and May 7, 2001, Boring admitted during individual therapy at Frontier Health that he had not used alcohol or marijuana but continued to experience nightmares and poor sleep. (R. at 176-77.) Boring also related that he had started taking monthly anger management classes at St. Mary's clinic. (R. at 176.) On both dates, Boring was diagnosed with cannabis dependence and an adjustment disorder with depression. (R. at 176-77.) A report from Frontier Health on May 16, 2001, indicated that Boring had been active in counseling and had attended regularly over the last quarter but had made only minimal progress in lifestyle improvement goals. (R. at 175.)

On April 23, 2001, Greene completed a Medical Source Statement Of Ability To Do Work Related Activities (Mental) on Boring. (R. at 219-22.) Although many areas were not assessed, Greene found that Boring had a fair ability to maintain personal appearance, to behave in an emotionally stable manner and to demonstrate reliability, while he had a poor or no ability to relate predictably in social situations. (R. at 219-22.) Greene based his opinion on Boring's presentation at the clinic and his compliance to treatment goals. (R. at 222.)

On June 7, 2001, Boring sought treatment at the VA, complaining of pain in his cervical spine without any upper extremity pain and a generalized anxiety disorder. (R. at 130-37.) The orthopaedic consultant, Dr. Judson C. McGowan, M.D., gave an impression that Boring suffered from degenerative disc disease. (R. at 131.) Dr. McGowan further reported that Boring was not a surgical candidate because Boring did not have symptoms, signs or imaging studies associated with diagnoses that require surgery. (R. at 132.) Dr. McGowan recommended that

-14-

Boring remain as physically active as possible. (R. at 132.)

On June 21, 2001, Boring visited Stone Mountain for his regular VA appointment. (R. at 232.) During this visit, Boring reported that, while he still felt a great deal of pain in his neck, the daily pain medication helped a lot. (R. at 232.) Boring stated that he was doing much better. (R. at 232.) Dr. Cruz assessed Boring with chronic neck pain and recommended that he continue physical therapy at the VA. (R. at 232.)

Despite Boring's somewhat regular attendance of therapy at Frontier Health for a few months, he resumed his pattern of missing appointments. (R. at 173-74.) On September 6, 2001, Boring was discharged from Frontier Health due to his failure to show up for counseling or to make other contact with his counselors. (R. at 169-74.)

On December 31, 2001, Boring visited Stone Mountain complaining of neck pain from an injury that had occurred the previous day when he turned his neck to the right while backing up his truck. (R. at 231.) However, Boring denied any numbness or tingling in his lower and upper extremities. (R. at 231). Dr. Cruz assessed Boring's condition as chronic neck sprain with muscle spasms of the neck; she treated the injury with an increase of Lortab and a continuation of Robaxin and Feldene. (R. at 230.)

On February 5, 2002, Boring visited the VA for a physical therapy consultation. (R. at 117-19.) Boring complained of pain in his cervical spine

-15-

bilaterally. (R. at 117.)

On April 3, 2002, Boring saw Dr. Cruz at Stone Mountain for a follow-up examination of his neck. (R. at 228.) Boring informed Dr. Cruz that he had not received any more physical therapy because he was discharged from physical therapy because of his continued neck pain. (R. at 288.) However, Boring stated that the massage, heat and ultrasound helped a lot with his neck pain. (R. at 228.) Dr. Cruz assessed Boring with chronic neck pain and hypercholesterolemia, recommended a low-fat diet for Boring and scheduled a MRI of Boring's neck. (R. at 228.)

On May 10, 2002, Dr. Kevin Blackwell, D.O., from the Virginia Department of Rehabilitative Services, performed a medical consultant examination on Boring. (R. at 243-48.) The examination revealed negative straight-leg raise testing, no foot drop and no significant abnormalities of the extremities, except for some crepitance of the knees. (R. at 244.) Boring's upper and lower joint examinations were otherwise normal, and his fine motor movements were good. (R. at 244.) Boring's deep tendon reflexes in the upper and lower extremities were within normal limits bilaterally, and his tandem gait was good. (R. at 244 .) An x-ray of Boring's cervical spine showed some reversal of the normal lordotic curvature and slight irregularity of the anterosuperior margin of C4, which could have been related to an old injury, while an x-ray of the lumbar spine was negative. (R. at 248.) Dr. Blackwell diagnosed Boring with cervical/lumbar disc disease, bilateral patellar femoral syndrome, bilateral subacromial bursitis and post-traumatic stress disorder. (R. at 244.) Dr. Blackwell reported that Boring was limited to lifting items, which

-16-

weighed up to 40 pounds on occasion, 30 pounds intermittently and 20 to 25 pounds frequently. (R. at 244-45.) Dr. Blackwell determined that Boring should be capable of sitting for eight hours in an eight-hour workday and standing for six to eight hours. (R. at 245.) However, Dr. Blackwell opined that Boring should avoid squatting, kneeling or crawling. (R. at 245.)

On May 15, 2002, B. Wayne Lanthorn, Ph.D., performed a mental status evaluation on Boring. (R. at 249-54.) Based on Boring's answers to mental status exam questions and his quality of verbalizations, Lanthorn reported that Boring's estimated intellectual functioning was average or above. (R. at 251.) Lanthorn further reported that Boring related to him appropriately and should be able to relate adequately to others. (R. at 252.) Lanthorn also opined that Boring did not appear to be limited in his ability to understand and to remember and was able to attend and to concentrate but may have some difficulty sustaining a routine due to post-traumatic stress disorder symptoms and depression. (R. at 253.) Lanthorn reported that Boring's social interaction appeared to be fair, but that Boring may have some difficulty responding appropriately to criticism from supervisors due to current symptoms of depression and anxiety. (R. at 253.) Lanthorn further determined that Boring should be able to travel unaccompanied, to make plans, to set goals and to be aware of normal hazards and to take precautions, although he might have some difficulty adapting to change and dealing with stress. (R. at 253.) Lanthorn also observed that Boring had a history of alcohol usage but had decreased his usage in the last two months. (R. at 253.) Lanthorn diagnosed Boring with alcohol dependence in early partial remission, post-traumatic stress disorder, a depressive

-17-

disorder and found Boring's GAF to be 50[3]. (R. at 253.)

On May 24, 2002, Howard Leizer, Ph.D., a state agency psychologist, performed a Mental Residual Functional Capacity Assessment and completed a Psychiatric Review Technique form, ("PRTF"), on Boring. (R. at 255-72.) Leizer found that Boring was not significantly limited in his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to understand and remember detailed instructions, to carry out very short and simple instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to make simple work-related decisions, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 255-56.) Leizer found that Boring was moderately limited in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and

---

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates"[s]erious symptoms...OR any serious impairment in social, occupational, or school functioning..." DSM-IV at 34.

length of rest periods, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 155-56.) Leizer found no evidence of limitation in Boring's ability to travel to unfamiliar places or use public transportation and to be aware of normal hazards and take appropriate precautions. (R. at 256.) Leizer's findings were affirmed August 14, 2002, by Hugh Tenison, Ph.D., another state agency psychologist. (R. at 257.)

In the PRTF, Leizer concluded that Boring had an affective disorder, an anxiety-related disorder and a substance addiction disorder. (R. at 259.) He found that Boring was mildly limited in activities of daily living and in maintaining social functioning and moderately limited in maintaining concentration, persistence or pace. (R. at 269.) Leizer found that Boring was not limited by repeated episodes of decompensation. (R. at 269.) Leizer reported that Boring's allegations were partially credible; however, Boring's symptom-related limitations did not preclude competitive unskilled work requiring minimal supervision and social contact. (R. at 271.)

Dr. Richard M. Surrusco, M.D., a state agency physician, completed a physical residual functional capacity assessment for Boring dated March 29, 2002. (R. at 273-81.) Dr. Surrusco concluded that Boring could occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, stand and/or walk about six hours in an eight-hour workday and sit with normal breaks for six hours in an eight-hour workday. (R. at 274.) Dr. Surrusco assessed that Boring was unlimited in his capacity to push and pull, other than as indicated for lifting and/or carrying. (R. at 274.) Dr Surrusco reported that

-19-

Boring could occasionally climb, balance, stoop, kneel, crouch and crawl, which he noted were abilities inconsistent with Boring's treating physicians' conclusions about Boring's limitations. (R. at 276, 280.) Dr. Surrusco found that Boring should be able to do work as indicated by the RFC. (R. at 275.) Dr. Surrusco's findings were affirmed on August 14, 2002, by Dr. Donald R. Williams, M.D., another state agency physician. (R. at 126.)

On July 3, 2002, Boring visited Stone Mountain for a follow-up appointment. (R. at 226.) Boring reported that he had been taking his medication but was still experiencing muscle spasms in his neck. (R. at 226.) A urine sample was collected, and Boring, ultimately, tested positive for cannabinoid. (R. at 239.) Dr. Cruz assessed Boring with chronic neck pain with muscle spasms of the neck, advised Boring to have a MRI and continued Boring's use of Lortab, Robaxin and Feldene. (R. at 226.)

On July 19, 2002, the VA conducted a MRI scan of Boring's cervical spine. (R. at 310.) It revealed dehydrated nucleus pulposusess at C2-C7 and a pattern of small, centrally herniated disc lesions at C6-C7 with narrowed neural foramen and slightly narrowed spinal canal. (R. at 310.) The remainder of the study was unremarkable. (R. at 310.)

On July 23, 2002, a MRI was performed at the VA on Boring's neck and spine. (R. at 284.) The MRI revealed dehydrated nucleus pulposuses at C2-C3 down to the C6-C7 level without any associated flattening of the nucleus pulposus. (R. at 284.) It also revealed that there was a pattern of small, centrally herniated

-20-

disc lesions at C6-C7 causing some stenosis of the neural foramen bilaterally and slightly narrowed spinal canal; however, there was no fracture or subluxation. (R. at 284.) The remainder of the study was unremarkable. (R. at 284.)

On May 13, 2003, the VA performed x-rays of Boring's lumbosacral region. (R. at 309.) The x-rays showed minimal disc space narrowing at the L5-S1 level with minimal facet arthrosis representing mild degenerative changes. (R. at 309.)

On June 9, 2003, the VA took x-rays of Boring's cervical and lumbosacral spine that showed slightly narrowed neural foramen at C5-6 but no fracture, subluxation or any narrowed disc spaces. (R. at 308.) Views of the lumbar spine showed a mild degenerative arthritic change involving the articular facet at L5-S1. (R. at 308.)

On July 25, 2003, Boring had an orthopedic consultation with the VA. (R. at 319-21.) He complained of both neck pain and low back pain and was diagnosed with chronic neck pain and chronic low back pain. (R. at 319.) Boring was found to have dehydrated nucleus pulposuses at C2-C7 and a pattern of a small, centrally herniated disc lesions at C6-C7 with narrowed neural foramen and slightly narrowed spinal canal; the remainder of the study was unremarkable. (R. at 320.) X-rays revealed mild degenerative arthritic change involving the articular facet at L5-S1, but the images showed no fracture, subluxation or any narrowed disc spaces. (R. at 321.)

On August 19, 2003, Boring visited the VA for complaints of neck pain and

lower back pain. (R. at 306.) A MRI scan of Boring's lumbar spine revealed a small, left paramedian disc protrusion at the L1-2 level with no significant canal stenosis or foraminal narrowing. (R. at 307.) The MRI also revealed a mild circumferential bulge at the L3-4 and L4-5 levels but no significant canal stenosis or foraminal narrowing. (R. at 307.) Furthermore, a tiny midline disc protrusion at the L5-S2 level was seen with no significant canal stenosis or foraminal narrowing. (R. at 307.)

On August 21, 2003, Boring visited Dr. McGowan at the VA claiming back problems with numbness in his feet and fingers and burning sensations in his feet at night. (R. at 333-40.) Boring reported that he was taking anti-inflammatory medicine and muscle relaxants that were prescribed by a private physician but were not helping. (R. at 333.) Boring also told Dr. McGowan that he took Lortab, which he purchased "off the street." (R. at 333.) At this exam, Boring tested positive for cannabinoids, opiates, benzo, diazepin and Meprobamate. (R. at 338.) Boring was given instructions on accident prevention, weight control and risks of tobacco use. (R. at 338-40.)

Boring returned to the VA on October 30, 2003, complaining of severe back pain that had been caused by bending over to reach for a water hose. (R. at 328-32.) Boring was diagnosed with low back pain and prescribed Toradol, Indocin, Flexeril and Lortab. (R. at 329.) Home exercise was suggested, and it was recommended that Boring be discharged from the Orthopedic Clinic because orthopedics had no other surgical procedures, rehabilitation or prosthetic intervention to offer Boring, except as previously recommended. (R. at 331.)

On January 28, 2004, Boring visited the VA complaining of pain in his lower back. (R. at 375.) Boring was given Decadron and Toradon, instructed to use Indocin and Lortab and prescribed Flexeril.

On April 20, 2004, Boring was again treated at Lonesome Pine for chronic lower back pain. (R. at 347-52.) Boring was discharged with instructions to use heat therapy and to rest for a few days. (R. at 347.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that

-23-

the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2004); 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 28, 2003, the ALJ denied Boring's claim. (R. at 14-23.) The ALJ found that Boring was insured for DIB purposes through December 31, 2001. (R. at 22.) Furthermore, the ALJ found that Boring had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ found that the medical evidence established that Boring suffered from a severe impairment, but that Boring did not have an impairment or combination of impairments listed at or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) The ALJ also found that Boring's allegations regarding his limitations were not totally credible. (R. at 22.) After considering all of the medical opinions in the record regarding the severity of Boring's impairments and the testimony from a vocational expert, the ALJ found that Boring had the residual functional capacity to perform light work, which can be performed with mild to moderate mental restrictions in the ability to perform work-related activities. (R. at 22.) Based on Boring's residual functional capacity, the ALJ found that Boring was able to perform his past relevant work as a maintenance worker. (R. at 22.) The ALJ found that Boring's medically determinable cervical and lumbar disc disease, post-traumatic stress disorder and substance abuse did not prevent him from performing his past relevant work. (R. at 22.) Thus, the ALJ found that Boring was

-24-

not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2005)

Boring argues the ALJ's decision was not based on the substantial evidence of the record. (Memorandum In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 6, 13.) Specifically, Boring argues that the ALJ erred in finding that Boring's post-traumatic stress disorder imposes only "mild to moderate mental restrictions" on his ability to perform work-related activities. (Plaintiff's Brief at 5.) Boring further argues that the ALJ erred in finding that Boring can return to his past relevant work as a maintenance worker. (Plaintiff's Brief at 13.) Lastly, Boring argues that the ALJ erred in finding that Boring can do alternative work. (Plaintiff's Brief at 8-9.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the

-25-

medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger,* 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano,* 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Boring argues that the ALJ erred in finding Boring's post-traumatic stress disorder only places a mild to moderate restriction on Boring's ability to perform work-related activities. (Plaintiff's Brief at 5-13) In particular, Boring argues that the ALJ did not sufficiently explain his inconsistent treatment of Dr. Lanthorn's report, nor did he sufficiently explain his rationale for rejecting Dr. Leizer's assessment dated May 24, 2002, and Eric Greene's opinion. (Plaintiff's Brief at 5-13.) Based on my review of the record, I find that substantial evidence supports the ALJ's finding as to the degree of limitation that Boring's post-traumatic stress imposes, including his weighing of the medical evidence.

The record reveals that Boring treated with the VA for post-traumatic stress disorder beginning February 25, 1995. (R. at 155.) However, none of the VA notes from this period indicate that any restrictions were placed on Boring's work-related abilities due to post-traumatic stress disorder. On July 31, 1995, Boring reported that he was doing well and was not suffering from nightmares or any other symptoms associated with post-traumatic stress disorder. (R. at 148-52.) Boring

-26-

did not complain of post-traumatic stress disorder again until June 16, 2000, when he completed an initial screening form at Frontier Health in an attempt to aid his disability case. (R. at 218.) But as the ALJ noted, the post-traumatic stress symptoms that Boring complained of were primarily mild, as illustrated by Boring's testimony that his post-traumatic stress disorder only affected his daily living by causing bad moods, an increased agitation level and an intolerance to crowds and loud noises. (R. at 19, 394-95.)

In his therapy sessions with Eric Greene at Frontier Health, Boring complained of panic attacks, nightmares and flashback episodes. (R. 186, 192.) Green also treated Boring for his substance abuse. (R. at 176-77, 186, 191, 194.) Although Greene found Boring's ability to relate predictably in social situations to be poor, this assessment was based on Boring's compliance with treatment, which was marked by repeated absences and failure to make progress in his goals. (R. at 180-81, 222.) Greene found all of Boring's other abilities to make personal-social adjustments to be fair. (R. at 222.) The ALJ chose to reject Greene's opinion, in part, because Boring did not require significant mental health treatment or medication for any mental impairment. (R. at 20.) The ALJ also noted that Greene was not an acceptable medical source, and Greene's opinion seemed to derive from Boring's diagnoses of substance abuse but was not actually supported by the objective clinical findings of record. (R. at 20.)

On May 15, 2002, B. Wayne Lanthorn, Ph.D., performed a mental status evaluation on Boring. (R. at 249-54.) Lanthorn noted that Boring related to him appropriately and should be able to relate adequately to others. (R. at 252.)

-27-

Lanthorn also opined that Boring did not appear to be limited in his ability to understand and to remember and was able to attend and to concentrate but may have some difficulty sustaining a routine due to post-traumatic stress disorder symptoms and depression. (R. at 253.) Lanthorn reported that Boring's social interaction appeared to be fair, but that Boring may have some difficulty responding appropriately to criticism from supervisors due to current symptoms of depression and anxiety. (R. at 253.) Lanthorn further determined that Boring should be able to travel unaccompanied, to make plans, to set goals and to be aware of normal hazards and to take precautions, although he might have some difficulty adapting to change and dealing with stress. (R. at 253.) Lanthorn's findings also provide substantial evidence for the ALJ's decision, except for Lanthorn's finding that Boring had a fair ability to socially interact, which the ALJ rejected as based on Boring's subjective report of difficulties dealing with others and mood changes – allegations that the ALJ noted were not substantiated by the record. (R. at 19.) The ALJ indicated that there was nothing in the medical notes to support the assertion that Boring had a problem relating to various mental health professionals. (R. at 19.) The ALJ further found Lanthorn's finding that Boring had a GAF of 50 to be excessive, given the actual clinical findings on evaluation. (R. at 20.)

Howard Leizer, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment and PRTF for Boring on May 24, 2002. (R. at 255-72.) Leizer found that Boring was not significantly limited in all areas of understanding and memory, social interaction, and sustaining concentration and persistence, except for two areas of sustaining concentration and persistence, in which Leizer found Boring to be moderately limited. (R. at 255-56.) Leizer also

-28-

found that Boring was moderately limited in areas of adaptation. (R. at 256.) In the PRTF, Leizer found that Boring was mildly limited in activities of daily living and social functioning, moderately limited in maintaining concentration, persistence or pace and had no episodes of decompensation. (R. at 269) In evaluating Leizer's opinion, the ALJ rejected the notion that Boring was moderately limited in sustaining concentration and persistence because such a finding was inconsistent with the totality of Lanthorn's opinion and other mental health records. (R. at 20.)

Based on the above, I find that substantial evidence supports the ALJ's rationale in crediting evidence and his finding that post-traumatic stress disorder placed only mild to moderate limitations on Boring's ability to work.

Boring also argues that the ALJ erred in finding that Boring could return to his past relevant work. (Plaintiff's Brief at 13-14.) In order to determine whether a claimant can perform past relevant work, the ALJ normally should consider only work that (1) was performed in the prior fifteen years; (2) lasted long enough for the claimant to learn the job; and (3) was substantial gainful employment. *See Terrell v. Apfel*, 147 F.3d 659, 661 (8th Cir. 1998.)

I find that the medical records support the ALJ's finding that Boring retained the residual functional capacity to return to the work he previously performed as a maintenance worker. The determination that Boring could perform light work is supported by Dr. Blackwell's opinion that Boring could carry items weighing up to 40 pounds on occasion, 30 pounds intermittently and 20 to 25 pounds frequently. (R. at 245.) Dr. Blackwell further found that Boring could sit for eight hours in an

eight-hour workday and stand for six to eight hours in an eight-hour workday. (R. at 245.) Although Dr. Blackwell also opined that Boring should avoid squatting, kneeling or crawling, the ALJ found this restriction inconsistent with the minimal objective findings reported by Dr. Blackwell, the VA or Dr. Cruz. (R. at 19, 245.) Dr. Surrusco, a state agency physician, determined that Boring could occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, stand and/or walk about six hours in an eight-hour workday and sit with normal breaks for six hours in an eight-hour workday. (R. at 274.) Dr. Surrusco further found that Boring was unlimited in his capacity to push and pull and could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 276, 280.) Therefore, I find that substantial evidence supports the ALJ's finding that Boring was capable of performing light work.

The vocational expert testified at Boring's hearing that the position of maintenance worker was unskilled and light in exertion. (R. at 399.) Therefore, upon a determination that Boring retained the residual functional capacity to perform light work, which can be performed with mild to moderate mental restrictions in the ability to perform work-related activities, the ALJ found that Boring could perform the duties of a maintenance worker, which was a position that did not involve significant personal interaction. (R. at 19-21.) Since the court has previously held that substantial evidence supports the ALJ's determination as to Boring's residual functional capacity, the court will likewise hold that there is substantial evidence to support the ALJ's finding that Boring can return to his past relevant work as a maintenance worker. In making this determination, it must be recognized that the inability to work without any subjective complaints does not

-30-

itself render a claimant totally disabled. *Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996.)

Even assuming that Boring could not return to work as a maintenance worker, the court does not accept Boring's final argument that he was precluded from performing alternative work that was light in exertion and could be performed with mild to moderate mental restrictions. (Plaintiff Brief at 14-16.) The vocational expert testified that jobs existed in the economy in significant numbers that could be performed by someone limited to light work and who possessed mild to moderate mental restrictions. (R. at 399-400.) These jobs included the positions of sales clerk, order clerk, stock clerk, cleaner, cashier, information clerk, hand packager, sorter and assembler. (R. at 399-400.) Therefore, the court finds that substantial evidence supports the ALJ's decision that Boring was capable of performing alternative work.

## *IV. Conclusion*

For the foregoing reasons, I will overrule Boring's motion for summary judgment, sustain the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

An appropriate order will be entered.

DATED:    This _21st_ day of December 2005.

_[signature]_

SENIOR UNITED STATES DISTRICT JUDGE